SILVERSTEIN ET AL. *v.* CENTRAL FURNITURE COMPANY, INC.

[No. 18,984. Filed December 1, 1959. Rehearing denied January 7, 1960. Transfer denied October 11, 1960.]

172

*Benjamin G. Cox* and *Gambill, Cox, Zwerner & Gambill*, of Terre Haute, for appellants, Elsa A. Silverstein and Arthur Justin, Co-Executors of David Silverstein, and Elsa Silverstein.

*Dix, Dix, Patrick & Ratcliffe*, of Terre Haute, for appellants, Samuel Solomon, Joseph Solomon and others.

*Harold J. Bitzegaio* and *Hansford C. Mann*, both of Terre Haute, for appellee.

MYERS, C. J.—This action was originally brought by appellee, Central Furniture Company, Inc., hereinafter called the Company, against David Silverstein, hereinafter called David, Elsa A. Silverstein, hereinafter called Elsa, Mollie Solomon, hereinafter called Mollie, and Mollie's husband, Samuel Solomon, hereinafter called Samuel, seeking to have a deed and certain other documents declared a mortgage, and to recover money received from a fire insurer for a fire loss suffered on the real estate involved in excess of the alleged mortgage indebtedness.

Mollie died prior to the trial and Joseph Solomon as Executor under her Last Will and Testament was substituted as a party defendant.

The issues were made by appellee's complaint and appellants' answers thereto in general denial. A trial by the court resulted in a finding for the appellee against Elsa and Mollie's Executor, declaring the warranty deed to be a mortgage fully paid and satisfied, and judgment against Elsa and Joseph Solomon, Executor of the Last Will and Testament of Mollie Solomon, Deceased, in the amount of $23,486.

At the close of plaintiff's evidence at the trial, appel-

lants filed a motion for finding and judgment on the ground that plaintiff-appellee had failed to prove the material allegations of its complaint and that the evidence was insufficient to sustain the finding and judgment against appellants, which motion was overruled. At the close of all the evidence, appellants filed a similar motion, which was likewise overruled.

In their assignment of errors, appellants state that the court erred in that the amount of recovery was too large, that the decision of the court was not sustained by sufficient evidence and was contrary to law, that the court erred in overruling appellants' motions for finding and judgment at the close of plaintiff's evidence and at the close of all the evidence, and that it erred in overruling appellants' motion for a new trial.

The motion for new trial contained the same specifications of error as the assignment of errors, with additional specifications pertaining to the court's rulings on the admission and exclusion of evidence during the trial.

In their argument, appellants rely mainly on the charge that the decision of the court was not sustained by sufficient evidence, and they have divided the argument into four main sections, as follows: (1) The insufficiency of evidence to show that the deed involved actually constituted a mortgage; (2) that there was insufficient evidence to show that the person who purported to act as an alleged agent for the grantees named in the deed was in fact their agent, or, if so, that he possessed authority to act for them in any other way than that of obtaining an outright conveyance of real estate instead of a mortgage; (3) that there was insufficient evidence to show that the grantees of the deed ratified any unauthorized acts on the part of an alleged agent purporting to create a mortgage in the execution of the deed rather than an outright conveyance of real

estate; and (4) that the court committed error in the admission and exclusion of certain evidence during the trial of the case.

This court will consider that evidence most favorable to the appellee, together with all the inferences reasonably deducible therefrom and favorable to its cause. We will not reexamine or weigh the sufficiency of the evidence, since that function is entrusted to the trial court. The only function this court exercises on appeal is to see if there was some competent evidence, whatever its weight, to support the trial court's determination. *Heffington* v. *Tichenor* (1946), 116 Ind. App. 475, 65 N. E. 2d 500. If there is some competent evidence of probative value in favor of the trial court's judgment, it will be affirmed. *Noyer, Exr., et al.* v. *Ecker et al.* (1954), 125 Ind. App. 63, 119 N. E. 2d 902; *Haley* v. *Williams, Trustee, etc., et al.* (1955), 125 Ind. App. 377, 123 N. E. 2d 921. This being the case, we shall now see what the record reveals.

The appellee Company was a corporation, all the shares of stock of which were owned by one Samuel Silverstein. He sold 51% of his interest in the corporation to Max Barnaby, who became the president of the corporation and a member of the board of directors. Samuel Silverstein was a sick man and under guardianship to his wife, Annis, who was a member of the board of directors of the Company and represented him as his guardian in stockholders' meetings. David Silverstein, one of the appellants herein, was a brother of Samuel Silverstein and Mollie Solomon, Deceased, whose personal representative is one of the appellants herein. Elsa, one of the appellants herein, was David's wife. The transaction by which Barnaby purchased 51% of the capital stock of the corporation from Samuel Silverstein was negotiated by David.

In January, 1954, the Company was faced with grave financial problems. The real estate owned by the Company was subject to a first mortgage in favor of The Merchants National Bank of Terre Haute in the approximate amount of $10,400. David was one of several guarantors of this mortgage. The real estate was also subject to a second mortgage to David and Mollie in the total sum of $4,500. The Company was subject to creditors' claims in an unstated amount and unpaid taxes in the amount of approximately $1,800.

On or about January 3, 1954, Barnaby and David had a conversation pertaining to borrowing money in the round figure of $16,000. Barnaby suggested a new loan with the bank, and asked David if he would co-sign a note for the Company. A few days later, David told Barnaby that, rather than go to the bank, he would loan the Company the money himself, and said he would have his attorney, David Rosenfeld, prepare the papers. About January 9th or 10th there was a conference with David, Barnaby and Rosenfeld, in which it was suggested that David would loan the Company $16,000 and take a mortgage as security. Rosenfeld objected to this, on the ground that if the Company went into bankruptcy David might lose his money. David suggested that the Company convey the property by deed to him and he would sell the property back on contract. This was objected to by Rosenfeld for the same reason. Rosenfeld then suggested that the Company give a deed for the buildings to David and that David should sell them back in a year, for the reason that "after one year the creditors couldn't come in but they would come in if it was just a few months." It was agreed that David would advance $21,500 in return for which there would be a "sale" by the corporation, with a lease back to it, together with an option to buy at a subsequent

date. Rosenfeld was to prepare the necessary papers and also determine the exact amounts owing by the Company.

There was a meeting on February 20, 1954, at which David was present, with papers and documents prepared by Rosenfeld. These consisted of a corporate deed of the Company premises to Elsa and Mollie and a standard-form lease of the premises back to the Company by Elsa and Mollie, with an option to purchase, to be executed one year on or after March 1, 1955. Attached to the lease was a document entitled "Contract Sale of Real Estate," wherein Elsa and Mollie, as sellers, agreed to sell the property to the Company. Included in the papers and documents above referred to were also corporate minutes of a purported directors' meeting and stockholders' meeting of the Company approving the sale and setting forth details of the transaction. These documents were modified as the result of another lawyer checking them and making suggestions for revision. They were presented formally to Elsa and Mollie at Rosenfeld's office on February 23, 1954, and signed by them. It was explained by David that the papers had been drawn up in the names of his wife and Mollie, instead of him, because he wished to keep his name from appearing on any papers or documents due to his bad health. The deed was signed by Barnaby as president of the Company and witnessed by its secretary. The lease was duly signed by Elsa and Mollie and by Barnaby as president of the Company. The contract sale of real estate was left with blanks unfilled as to dates and amounts, but was signed by Elsa and Mollie and Mollie's husband, but was unsigned by Barnaby for the Company. No money was transferred on that date.

The United States documentary stamps on the face of the deed were in the sum of $23 and represented a

total consideration of a little over $21,000 ($1.10 in stamps per $1,000 consideration). The figure of $21,500 had been worked out by a formula agreed to by the parties, wherein The Merchants National Bank was to be paid in full and its mortgage released; Elsa and Mollie were to be paid the amount of the second mortgage and it was to be released; delinquent taxes were to be paid; David was to be paid the sum of $500 for services rendered; and the balance, after payment of attorney fees and miscellaneous expenses, was to be turned over to the Company. This balance was in the amount of $3,866.58. Barnaby had previously asked David if he could not raise that amount to the $6,000 mark, but David had answered: "That is all I want to loan."

At the time there were two fire insurance policies on the buildings belonging to the Company, one for $38,000 and the other for $5,000, totaling $43,000. Rosenfeld, at the meeting of February 20th, had stated that this insurance would have to be transferred to Silverstein "to make the so-called contract appear realistic." At this meeting, Rosenfeld, David, Edward C. Chaskin and Annis Silverstein were present. Chaskin, Annis and Barnaby were the directors of the Company. Annis, as guardian, and Barnaby owned all the stock. This was the purported date whereon the directors and stockholders met to approve the transactions. At that time Barnaby stated that he wanted it understood that this was to be a loan and not a sale, and that it was a means to give David security for the Company's loan. There was a tenant occupying space in the premises, by the name of Salyard, who operated the Ace Washer Supplies and paid the Company $100 a month as rent. Among the papers signed on February 23, 1954, were an assignment of the lease by the Company to Elsa and Mollie,

and notices to Salyard that from thenceforth he was to pay the rent to Elsa and Mollie.

On March 8, 1954, Elsa and Mollie opened a joint account in The Merchants National Bank and deposited $21,000 therein. Checks were drawn by Elsa and Mollie, all dated March 8, 1954, as follows: $10,472.18 payable to the Company and The Merchants National Bank as payees; $2,250 payable to the Company and Mollie Solomon as payees; $2,250 payable to the Company and David Silverstein as payees; $1,653.04, payable to the Company and the County Treasurer as payees; $173.20 payable to the Company and the County Sheriff as payees; $3,866.58 payable to the Company. These checks were all endorsed by Barnaby as president of the Company and delivered to the payees named therein. The mortgages were released of record and apparently those obligations satisfied. The check made payable to the Company was deposited in its account at the bank. It was shown that there was $40 of intangible stamps purchased for the deed and that Rosenfeld had been paid $249.50 for attorney fees and incidental expenses. These sums total $20,954.50. There is nothing in the record to show that David received $500 from Elsa and Mollie.

Elsa and Mollie paid the real estate taxes due in 1954. They also paid the premium on fire insurance.

On December 24, 1954, the building was destroyed by fire. The insurance money, totaling $43,000, was paid almost a year later to Elsa and Mollie. The Company made demand on Elsa and Mollie for the balance of the insurance money remaining in their hands after deducting what was owing them as a result of the transaction of February 23, 1954. Upon their refusal to do so, the Company brought suit and obtained a judgment as a result thereof in the amount of $23,486. In making

this determination, the court made a finding that Mollie and Elsa actually loaned the Company $21,500, and that the deed was actually a mortgage which had been fully paid and satisfied, and so ordered in its entry of judgment.

In the first conversation which Rosenfeld had with David, he was told that the loan was to be repaid at the rate of $200 a month plus rent from Ace Washer Supplies, the tenant. In addition, the mortgagee was to pay taxes and insurance, as well as maintenance, which items were to be charged to the indebtedness. Interest was to be at the rate of 5% per annum.

Later, when the parties had decided on the deed arrangement, with lease back to the Company, the same provisions were incorporated in the lease. The so-called rental was $200 a month. The so-called lessors were to pay for insurance and taxes, as well as maintenance costs. The lease provided that after one year the Company would have the irrevocable option to purchase back the real estate, and if it decided to exercise the option it would enter into a real estate purchase agreement, which was attached to the lease. The purchase price was to be determined by subtracting from the sum of $21,500 all rents received from the Company and any other tenant. Then there would be added to that amount (1) a sum equal to interest at the rate of 5% per annum on $21,500 from date of execution of the lease contract to date of execution of the real estate purchase contract; (2) a sum equal to all real estate taxes and insurance premiums paid by the lessors during that time; and (3) a sum equal to all amounts expended to make repairs. The resulting purchase price would be paid by the Company in equal monthly installments of $200 a month, together with interest at the rate of 5% per annum on the purchase price. Any amounts expended by Elsa

and Mollie for taxes, insurance and maintenance were to become an integral part of the principal indebtedness under the terms of the real estate purchase contract. It is to be noted that Elsa and Mollie signed the real estate purchase contract in blank on February 23, 1954. The only positive sum mentioned in that agreement at that time was that the Company was to pay $200 a month on the purchase price, together with interest on the deferred payments at the rate of 5% per annum. The amounts of the principal indebtedness and the purchase price were left blank.

Appellants argue that the evidence is insufficient upon which the court could determine that a mortgage relationship existed. There is no question but that a deed, absolute and unconditional on its face, may have been intended and understood by the parties to be merely security for the payment of a debt. In such event it will be regarded and treated in equity as a mortgage, with the parties having relative rights and remedies of a mortgagor and mortgagee. *Kerfoot v. Kessener* (1949), 227 Ind. 58, 84 N. E. 2d 190; *Douglass v. Rights* (1918), 68 Ind. App. 111, 119 N. E. 1017; *Calahan v. Dunker* (1912), 51 Ind. App. 436, 99 N. E. 1021; *Barber v. Barber* (1946), 117 Ind. App. 156, 70 N. E. 2d 185; *Turpie et al. v. Lowe* (1888), 114 Ind. 37, 15 N. E. 834.

The main question is whether the parties intended to extinguish a debt. If they did so, it is considered a sale. If they did not, it is considered a mortgage. This is a matter for the court or jury to decide from the evidence. *Wolfe et al. v. McMillan* (1889), 117 Ind. 587, 20 N. E. 509. The intention of the parties must be gathered from all the instruments, proceedings and negotiations leading up to the execution of the deed therein. *White v. Redenbaugh* (1908),

41 Ind. App. 580, 82 N. E. 110. The court must consider all the surrounding circumstances, the relative situation of the parties at the time, their conduct, declarations and attitude, and any and all facts which would tend to show the true nature of the transaction. *Barber* v. *Barber, supra; Beidelman* v. *Koch* (1908), 42 Ind. App. 423, 85 N. E. 977. In *Calahan* v. *Dunker, supra,* the court said as follows (at page 448 of 51 Ind. App., at page 1025 of 99 N. E.) :

> "The controversy here is between the original parties to the transaction, and under the issues the intention of the parties at the time of the original transaction is controlling in determining whether the deed was intended as a conveyance to a purchaser or as a security for a debt. . . .
> "Any provable fact tending to reveal the intent of either or both the parties was competent evidence."

Appellants say there is no evidence of a defeasance in the transaction, which is necessary in creating a mortgage relationship. It is generally considered that it is not necessary for the defeasance to be in any particular form, provided that there is evidence of an intention of parties to defeat and terminate the mortgagee's title on performance of the conditions secured by the deed. 59 C. J. S., Mortgages, §24, p. 60. It may also rest upon a verbal agreement rather than one in writing. *Barber* v. *Barber, supra.*

There was sufficient evidence from the testimony of Rosenfeld and Barnaby that there could be reasonable inference that at all times the parties considered the transaction a loan and the monies advanced in the sum of $21,500 an obligation to be repaid in the future. At the meeting of February 20, 1954, when Barnaby requested $6,000 instead of the $3,866.58, David refused, saying: "That is all I want to loan."

At the same meeting, Barnaby insisted to all present: "This is a loan. This is a loan but not a sale—it is the means to give Mr. Silverstein security on my loan." The lease as shown provided for an irrevocable right on the part of the Company to exercise an option to repurchase the property one year after the transaction. The real estate purchase contract was in fact previously signed by Elsa and Mollie on the same date that all the other documents were signed. It is true that by the written agreements the appellee did not promise to purchase back the real estate upon payment of the $21,500 plus the other expenses previously set out. But this fact of itself does not show conclusively that the delivery of the deed was a sale. *White* v. *Redenbaugh, supra.* In our opinion, there was sufficient evidence from which the court could have inferred that the Company was going to pay back the indebtedness and expected the return of its title to the real estate.

Appellants say that there was no evidence of a pre-existing debt. It has been shown that the reason for the Company's president first talking to David was in order to borrow sufficient money to pay debts owing to the bank, David and Mollie, the government and other creditors. Elsa and Mollie paid these debts and created a new indebtedness to the Company in the amount of $21,500.

In *Voss et al.* v. *Eller* (1887), 109 Ind. 260, 263, 10 N. E. 74, 75, 76, our Supreme Court said:

> "A recognized method by which to determine whether a deed, absolute on its face, may nevertheless operate as a mortgage, is to ascertain whether or not at the time of its execution, there was a preexisting or *concurrently created debt* by way of loan, owing to the grantee, the subsequent payment of which, in pursuance of a contemporaneous agreement, entitled the grantor,

.or debtor, to a reconveyance of the estate." (Our emphasis.)

The $21,500 debt, concurrently created as a loan at the time the deed and other documents were executed and delivered, is a sufficient answer to appellants' objection.

Appellants argue that there was no showing of inadequate consideration, which is a fact which tends to establish that a deed is a mortgage. However, the insurance policies were based on actual cash value of the buildings at time of loss. They totaled $43,000. There was testimony by a real estate agent that the ground alone, if separated from the buildings, was worth $10,400. There were also tax duplicates for payment of real estate taxes for the year 1954 introduced in evidence, which show assessed net value of the property at $14,240, which, under the assessment statute (Acts 1949, ch. 225, §5, p. 724, Burns' Ind. Stat., §64-1019 [Note]), reflects the property as being appraised at $42,720. While these duplicates are not admissible in evidence to show the value of the real estate, the court was at liberty to weigh them with other evidence and draw reasonable inferences from their provisions. Under these circumstances, we hold that the trial court could reasonably infer that the so-called purchase price was inadequate.

In determining the intention of the parties, the testimony of Barnaby and Rosenfeld is quite revealing. They both testified that in their preliminary conversations with David a loan was contemplated at all times. When Rosenfeld suggested that a deed be executed and delivered, there is ample evidence from which the court could have inferred that this transaction merely involved the mechanics and method of making a loan to be secured with real estate rather than an actual sale of the prop-

erty. There was testimony that David had told Barnaby on the day after the fire that as soon as he had made arrangements to collect the insurance he would settle with the Company and pay its portion. The evidence further reveals that possession of the premises was never surrendered by the Company after the transaction, but that it stayed in the building, and some time shortly after March 1, 1954, a mortgage exemption was filed in its name with the county auditor.

It was further shown that the agreement between the Company and Elsa and Mollie provided for them to pay the insurance, taxes and maintenance costs on the building, but when the Company was to repurchase the property these amounts were to be added to the purchase price. Likewise the rental, which came in from Ace Washer Supplies, was to be applied as a credit, thus actually the Company in the end was entitled to any rents and profits from the building, and also obligated to pay taxes, insurance and maintenance.

On February 23rd, when all the papers were signed, no money passed hands. Checks were finally drawn and delivered on March 8, 1954. The record does not reveal that an abstract of title was prepared and brought up to date, that there was any opinion by an attorney concerning the validity of title, or that there was any title insurance applied for or taken out. These actions are usually customary when there is a sale of real estate. It has been pointed out that David, Elsa and Mollie were all related, and that Mollie's brother owned a 49% interest in the corporation. The parties therefore were not dealing at arm's length at the time the negotiations and transaction took place. From the testimony and circumstances presented, we believe that the trial court could have inferred that the intention of the parties

was to create a mortgage loan rather than a deed absolute.

Appellants have attempted in their brief to distinguish between testimony of the various witnesses which was admitted over their objection and that which was not. In their motion for new trial they predicate error upon 73 rulings of the trial court in either admitting or rejecting certain evidence during the course of the trial. The objections are set forth in the motion, which is quoted verbatim in that part of the appellants' brief entitled Statement of the Record. However, they are not properly presented to this court under Rule 2-17 of the Rules of the Supreme Court. There is no reference to where any of them may be found in the transcript, by referring to page and line, and they are not separately specified as error in the Argument. *Inland Steel Co.* v. *Smith* (1907), 168 Ind. 245, 80 N. E. 538; *Noble County Bank* v. *DePew* (1918), 68 Ind. App. 406, 120 N. E. 605; *Gambino* v. *State* (1930), 202 Ind. 81, 170 N. E. 541. Thus, we will not touch upon them except to say that most of the objections presented by appellants were directed to testimony admitted by the court which tended to prove a mortgage transaction. Appellants claim that the deed, lease and agreement to purchase show on their faces what they purported to be, and that the trial court erred in admitting this oral testimony which tended to vary or modify the nature of the instruments and to infer that the deed was actually security for a loan rather than a true conveyance. However, it is well established that in these cases parol evidence may be used to show the true nature of the transaction. *Barber v. Barber, supra.* This permits the court to determine whether the deed was actually a disguise for a mortgage loan. To permit this parol evidence does not harm the named grantee

in the deed, for if the evidence reveals a genuine conveyance, the deed will be upheld. *Beidelman* v. *Koch, supra.*

From the facts presented by the evidence, we believe that this case falls within the law as set forth in *White* v. *Redenbaugh, supra.* In that case Carrie Redenbaugh and her husband were indebted to one White on a note and mortgage in the amount of $425. When it became due White threatened to foreclose if the note were not paid at once. He then offered to extend the loan for one year in exchange for an absolute deed to the property, which he promised he would reconvey if the $425 were paid within one year with interest at 7% from the date the note became due, also providing that the Redenbaughs paid all taxes and liens. There was a separate written agreement which gave White a lien on the crops for accrued interest, and provided that if the $425 and interest were not paid within the year the deed would remain valid. The written agreement did not bind the Redenbaughs to pay the $425 for which the reconveyance was to be had. The court held that this was a mortgage transaction and not the conveyance by deed of real property. In so doing the court stated that, in order to determine whether the debt was extinguished, the intentions of the parties must be considered, and proceeded to name some specific circumstances which would justify the trial court in finding that the mere delivery of a deed did not extinguish the debt and that it was the intention of the parties that the obligation should remain. The court said as follows (at pages 583, 584, 585 and 586 of 41 Ind. App., at pages 111 and 112 of 82 N. E.) :

> "The amount of the debt is the exact sum set out in the deed as the consideration for the conveyance. On payment of said amount, White agreed to reconvey the property to any one whom appellee might

name within one year. . . . It further provided that the interest should accrue at the rate of seven per cent from August 16, 1904, being the date of maturity of said note. The separate contract and deed were dated and executed August 20, 1904. The fact that interest is payable by the terms of the contract is a circumstance tending to show that the debt was not extinguished. Furthermore appellee bound herself to pay the taxes on the land for the year agreed, and to pay all liens which White might pay or which might attach to the land. . . . The inadequacy of the consideration is obvious, and it has been held repeatedly that inadequacy is a fact tending to raise the inference that the transaction was a mortgage. . . .

"It was testified that White said he wanted the deed to secure himself, that all he wanted was his money, not the land. The appellee was allowed to remain in possession and to enjoy the income from the mortgaged property. The appellant held the record title of this property merely as security for his loan. Therefore the construing of the deed and separate instrument, aided by the testimony, shows the relation between the parties to be the same as if the deed had been a mortgage. Appellant must be considered as the mortgagee, out of possession of the mortgaged premises, and the same rules are applicable as if it had been a mortgage in the ordinary form. No rule of law is plainer or better understood than that the mortgagor of real estate has a right to the rents and profits so long as he remains in possession. . . .

"The proof shows that the debt was not extinguished, but, on the contrary, appellee was given one year and four days in which to pay the same, and the rate of interest was fixed the same as in the note, and upon payment of the debt and interest appellant was to reconvey to her the land in question. The facts presented by the record in this case establish that the instrument executed by appellee and husband to appellant on August 20, 1904, must be and is regarded as a mortgage."

It must be remembered that these parties were related to each other, by blood, marriage and business.

It can be assumed that they discussed this matter much more informally and with much deeper understanding among each other than if they had been strangers. The reasonable inference deducible from the evidence could lead the court to believe that the main purpose of their joint efforts was to keep the Company business going by obtaining a loan from within the family; that, however, they wished the best possible protection and security from such a loan so as not to lose any part of it in the event of failure and resulting bankruptcy. The well-prepared instruments involved herein were nothing but a camouflage to hide the real nature of the transaction and did not express the true intentions of the parties. As was said in *Kerfoot* v. *Kessener, supra* (at page 79 of 227 Ind., at page 199 of 84 N. E. 2d) :

> " '. . . if a conveyance is made as a security for money, in whatever form the conveyance is made, or whatever cover may be used to disguise the transaction and hide its real character from others, as between the parties and as to all persons who have notice that the property is merely held as collateral security, it will be held and treated as a mortgage.' "

Appellants argue that there was insufficient evidence to show that David at any time acted as an agent for Elsa and Mollie; that there was no actual or implied authority given to David by Elsa and Mollie to accept a mortgage rather than a deed, if there was any proof of agency at all; that the Company was authorized only to make a conveyance by deed, and that it acted outside the scope of its authority in creating a mortgage.

The record shows that neither Barnaby nor Rosenfeld saw or had any conversation with Elsa and Mollie. It does reveal sufficient evidence from which the court could have inferred that David was acting as an agent

for Elsa and Mollie, and not for any other persons. David was Elsa's husband, as well as being Mollie's brother, and there was testimony from Elsa that she had had conversations with him about the transaction. This fact is a circumstance which, when connected with others, could constitute proof of agency. *Barnett* v. *Gluting et al.* (1892), 3 Ind. App. 415, 29 N. E. 154, 927; *Roper* v. *Cannel City Oil Co.* (1918), 68 Ind. App. 637, 121 N. E. 96.

Rosenfeld was employed by David. His bill for legal services in connection with this matter was mailed to Elsa and Mollie. He testified that it was paid. Appellants argue that there was no evidence as to who paid it. During the examination of Rosenfeld concerning the mailing of this bill to Elsa and Mollie, the court asked the following questions:

"How was it sent to them [Elsa and Mollie]?
"A.   Mailed.
"Q.   And came back by check?
"A.   Yes. The check was drawn after these Exhibits already in evidence."

On March 8, 1954, Elsa and Mollie drew five separate checks amounting to $20,665 to pay the Company's indebtedness existing at that time.

During the preliminary negotiations, and up until February 20, 1954, the evidence was to the effect that David was going to loan the money. The only reason he did not put his name on the transaction was because he stated that he was a sick man.

The instruments involved in the transaction were requested by David and prepared by Rosenfeld. They were signed in Rosenfeld's office by Elsa and Mollie.

These circumstances, if not proof of express agency, are sufficient to permit the trial court to infer that an

implied agency existed between David and Elsa and Mollie. In *Heffner* v. *White* (1943), 113 Ind. App. 296, 305, 45 N. E. 2d 342, 346, this court said:

> "It must be admitted, however, that the relation of principal and agent is not always created by express agreement, but may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case."

It has been shown that after this lawsuit was filed by appellee, the appellants filed a counterclaim in the same action to quiet their title to the real estate. If David had acted without any authority from Elsa and Mollie by entering into a mortgage agreement instead of receiving a deed, the fact that appellants filed this counterclaim means that they bound themselves to the terms of the agreement as actually made by David. *Moore* v. *Butler University* (1882), 83 Ind. 376; *Johnson* v. *Hoover et al.* (1880), 72 Ind. 395. In the former case, Moore authorized his agent, Julian, to deliver a deed to the University providing the University agreed to move its campus to Irvington and build thereon within three years. Julian delivered the deed, but without obtaining the promise of the University to build within three years and, hence, did not act within the scope of his authority. The deed recited a consideration of $14,000. The University did not move within the three years and Moore sued to recover $14,000 purchase price. The Supreme Court held that the real consideration was the moving of the University, and that the question was that, since it had not been agreed upon by Moore, but was by his agent, Julian, was Moore bound by Julian's act? The court held that he was bound, and that by bringing the lawsuit he adopted the contract as between Julian and the

University exactly as Julian had agreed. The court said (at page 381 of 83 Ind.):

> "This price can not be recovered without an adoption of the contract upon which the conveyance was made, and when the contract is adopted the appellant is bound by the contract *as made*." (Our emphasis.)

In the present case, appellants could not bring suit to quiet title without adopting the contract upon which the conveyance was made, and when the contract was adopted they were bound by the mortgage loan features, which was actually what was agreed upon between the parties. Thus, David, in accepting a deed which was intended to be a mortgage, bound Elsa and Mollie, even though his actions were without authority from them, as they subsequently adopted the contract which he made when they filed suit to quiet title.

This answers appellants' objection that there is insufficient evidence to show that Elsa and Mollie ratified the unauthorized acts of their agent. If David acted without authority, appellants' action in filing their countersuit to quiet title was a ratification and recognition of his unauthorized actions.

Appellants state that Elsa and Mollie received copies of the corporate minutes which authorized a sale and conveyance with lease back and relied upon them as having contracted to receive a deed only. There is no evidence in the record that they ever received copies of those minutes or ever saw them.

Appellants say that it is significant that there was no communication by either the Company or Rosenfeld with Elsa and Mollie. However, if David was acting as their agent, there was no need for Barnaby or Rosenfeld to communicate with them, as an agent acts for his principals in the same manner

as though the principals themselves had acted. *Lincoln Nat. Bank & Trust Co.* v. *Parker* (1941), 110 Ind. App. 1, 14, 34 N. E. 2d 190, 37 N. E. 2d 5.

As to the unauthorized acts on the part of the corporation, even if true, we cannot see how they would benefit the appellants in this case. Furthermore, appellants have made mere abstract statements of law in their brief concerning this point without making any attempt to apply them to the facts. This is a waiver of any claimed error. *Poore* v. *Poore* (1955), 125 Ind. App. 392, 125 N. E. 2d 810.

Finally, appellants state that the court erred in assessing the amount of recovery, and that the amount is too large. They say that even if the judgment determined that they have no interest in the real estate, and that the deed was actually a mortgage, the insurance contract represents a contract between the insurance companies and Elsa and Mollie, and that in order to permit the Company to recover the balance there would have to be a reformation of the contracts of insurance between the insurance companies and appellants; that in decreeing that the balance of the proceeds should be paid to the Company, the trial court actually reformed the insurance contracts without having the insurance companies as parties, thus leaving appellants open to an equitable action with respect to whether or not the disposition of the insurance monies is proper in so far as the nonparties to the litigation are concerned. However, it seems obvious to us that the court was correct in applying insurance proceeds to pay off the mortgage, the effect of which was to extinguish appellants' interest in the real estate, as the purported assignment of the insurance policies to Elsa and Mollie was a part of the camouflage of the entire transaction. When the debt was paid, title to the real estate

was properly vested in the Company once more, subject to whatever insurable interest remained thereon, which in this case consisted of the balance of the proceeds of the fire insurance. As has been said by this court:

" '. . . the law looks through form to substance and will give effect to the real and dominant intention of the parties when definitely ascertained.' " *Kerfoot* v. *Kessener, supra* (at pages 78, 79 of 227 Ind., at page 199 of 84 N. E. 2d).

The court in deciding that this entire transaction was a mortgage loan was correct in determining that Elsa and Mollie were not entitled to keep more of the insurance proceeds than was required to satisfy the mortgage.

We are of the opinion that the evidence in this case was sufficient to establish a binding contract between appellants and appellee, by the terms of which the deed and contemporaneous documents here involved became and were in fact a mortgage.

Judgment affirmed.

Ax, Cooper and Ryan, JJ., concur.

NOTE.—Reported in 162 N. E. 2d 690.